******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# HOSPITAL MEDIA NETWORK, LLC *v.*
# JAMES G. HENDERSON ET AL.
## (AC 43986)

Prescott, Moll and Suarez, Js.

*Syllabus*

The defendant H, a former employee of the plaintiff, appealed from the judgment rendered on remand awarding damages to the plaintiff for H's breach of fiduciary duty. The plaintiff had employed H as its chief revenue officer until 2013 when it fired him for cause. Thereafter, the plaintiff brought an action against H, claiming, among other things, that he breached his fiduciary duty to the plaintiff by working for G Co., a private equity investment firm, to raise capital to acquire C Co., which was involved in the same business sector as the plaintiff, while he was employed by the plaintiff, during regular business hours, and without the plaintiff's permission or knowledge. G Co.'s acquisition of C Co. closed in 2013 shortly after H's employment was terminated, at which time H was paid a $150,000 finder's fee by either G Co. or C Co., was awarded a three year consulting contract with C Co. at $50,000 annually, and was given the opportunity to purchase restricted stock of C Co. H was defaulted for failure to comply with a discovery order and the trial court granted the plaintiff's motion for judgment on the default. Following a hearing, the trial court rendered judgment for the plaintiff and awarded damages against H. H appealed to this court, which reversed the judgment only as to the award of damages against him, concluding that the award did not achieve a just result, as it failed to take into account the equities of the case, and remanded the case for a new hearing in damages. On remand, the trial court rendered judgment in favor of the plaintiff in the amount of $323,545.84, which represented H's 2013 salary, certain consulting fees paid to H by the plaintiff, the finder's fee, and one year's worth of consulting fees under the consulting contract, and H appealed to this court. *Held*:

1. In rendering its judgment, the trial court acted within the scope of this court's remand order by making its own independent factual findings on the basis of the entire record before it and relying on those findings to assess the equities in the case: this court did not issue a circumscribed remand order binding the trial court to the factual findings in the first action but, rather, reversed the decision as to the damages award against H and remanded the case for a new hearing in damages; moreover, given that the record on remand included additional evidence, it followed that the trial court necessarily made its own findings on the basis of the totality of the evidence in the record and, in light of those findings, considered the relevant equitable factors in determining damages.

2. The damages award on remand was improper only insofar as the trial court ordered H to disgorge $50,000 in consulting fees paid pursuant to the consulting contract: contrary to H's claim, the court's finding that H did not perform substantial work before being hired by the plaintiff in 2013 that entitled him to the $150,000 finder's fee was not clearly erroneous, as it was supported by portions of the hearing testimony and the court was free to resolve any inconsistency in the testimony by crediting only the portions that buttressed its findings; moreover, although the record did not support the court's finding that H attempted to offer into evidence at the hearing in damages numerous exhibits that the plaintiff's counsel had not seen previously, that unsupported finding did not undermine appellate confidence in the court's fact-finding process and, accordingly, it was harmless; furthermore, although the court improperly ordered disgorgement of $50,000 of the $150,000 consulting fees, as it was prohibited by this court's previous decision from ordering disgorgement of amounts earned by H outside of H's period of employment with the plaintiff and it assumed that H had earned the consulting fees for services performed after his employment with the plaintiff had ended, the trial court did not otherwise abuse its discretion in awarding damages but, rather, properly balanced the equities and utilized the equitable remedies of forfeiture and disgorgement, as it properly consid-

ered the significant value of H's services to the plaintiff as an employee and balanced that against its other factual findings, the court was not precluded from finding that H acted wilfully and engaged in disloyal acts throughout his employment or from relying on such findings to issue the damages award, as they were supported by the record and fit within the guidance set forth in *Wall Systems*, *Inc.* v. *Pompa* (324 Conn. 718), there was no suggestion in the court's decision that it had used H's discovery violations to supplant the plaintiff's burden to demonstrate damages, and H's assertion that the plaintiff was unjustly enriched by the award was unavailing.

Argued February 2—officially released December 28, 2021

*Procedural History*

Action to recover damages for, inter alia, breach of fiduciary duty, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Hon. A. William Mottolese*, judge trial referee, granted the plaintiff's motion for default against the defendants and for nonsuit on the defendants' counterclaim; thereafter, the court, *Hon. A. William Mottolese*, judge trial referee, granted the plaintiff's motion for judgment on the default and rendered a judgment of nonsuit as to the defendants' counterclaim; subsequently, following a hearing in damages, the court, *Hon. Taggart D. Adams*, judge trial referee, rendered judgment for the plaintiff, and the defendants appealed to this court, *Alvord*, *Keller* and *Flynn*, *Js.*, which reversed the trial court's judgment only with respect to the award of damages against the named defendant and remanded the matter for further proceedings; thereafter, following a hearing in damages, the court, *Hon. Kenneth B. Povodator*, judge trial referee, rendered judgment for the plaintiff, from which the named defendant appealed to this court. *Reversed in part*; *judgment directed*.

*James G. Henderson*, self-represented, the appellant (named defendant).

*Gary S. Klein*, with whom was *Liam S. Burke*, for the appellee (plaintiff).

*Opinion*

MOLL, J. This matter returns to us following our decision in *Hospital Media Network, LLC* v. *Henderson*, 187 Conn. App. 40, 201 A.3d 1059 (2019) (*HMN*), in which this court reversed the judgment of the trial court rendered in favor of the plaintiff, Hospital Media Network, LLC, and against the self-represented defendant James G. Henderson[1] only as to the award of damages and remanded the case for a new hearing in damages. Id., 60. The defendant now appeals from the judgment rendered on remand awarding damages to the plaintiff. On appeal, the defendant claims that the trial court (1) exceeded the scope of this court's remand order in *HMN* and (2) awarded damages that were (a) predicated on factual findings that were not supported by the record and (b) inequitable.[2] We reverse, in part, the judgment of the trial court.

This court's opinion in *HMN* sets forth the following relevant procedural background, which, although lengthy, we recite to place the defendant's claims on appeal in their proper context. "In November, 2013, the plaintiff commenced this action alleging that the defendant, its former employee, violated the Connecticut Uniform Trade Secrets Act (CUTSA), General Statutes § 35-50 et seq., committed tortious interference with the plaintiff's business and contractual relations, breached the duty of employee loyalty, breached his fiduciary duty, and usurped corporate opportunities of the plaintiff. The defendant was defaulted, and the trial court [*Hon. Taggart D. Adams*, judge trial referee] held a hearing in damages. After the hearing, the court awarded the plaintiff damages solely on its claim of breach of fiduciary duty,[3] the essential elements of which were admitted by virtue of the defendant's default.

"With respect to its breach of fiduciary duty count, the plaintiff alleged that it employed the defendant as its chief revenue officer and paid him substantial compensation from January 1 to September 2013. On September 5, 2013, the plaintiff terminated the defendant's employment 'for cause for several reasons including, without limitation [the defendant's] actively working for various companies unrelated to [the plaintiff] for his own benefit and without [the plaintiff's] permission or knowledge during regular business hours.' Specifically, it alleged that the defendant worked for or on behalf of Generation Partners (Generation), a private equity investment firm, 'to raise capital for other digital media companies including but not limited to' Captivate Network Holdings, Inc. (Captivate), and used the plaintiff's computers and infrastructure to conduct business for those other digital media companies without the plaintiff's permission or knowledge. The plaintiff claimed that the defendant played golf on a social basis and otherwise took time off during regular business

hours without the plaintiff's permission.

"The plaintiff further alleged that the parties had a fiduciary relationship 'by virtue of the trust and confidence' the plaintiff placed in the defendant as its chief revenue officer, a senior executive position. Among the duties allegedly owed to the plaintiff were the duty of loyalty, the duty to act in good faith, and the duty to act in the best interest of the plaintiff. The plaintiff asserted that the defendant breached these duties in advancing his own interests to the detriment of the plaintiff. Lastly, the plaintiff alleged that the defendant's breach caused it to sustain damages. The plaintiff sought, inter alia, compensatory and punitive damages.

"The defendant answered and filed an amended counterclaim, alleging breach of contract, wrongful termination, misrepresentation and deceit, and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. The defendant requested, inter alia, compensatory and punitive damages.

"The parties engaged in discovery disputes, resulting in an April, 2016 order from the court [*Hon. A. William Mottolese*, judge trial referee] that the parties 'confer face-to-face in an effort to resolve these discovery disputes, bearing in mind that reasonable good faith efforts at compromise are essential to every discovery dispute.' On June 27, 2016, after finding the defendant's objections to the plaintiff's discovery requests 'intentionally evasive and intended to obstruct the process,' the court ordered full compliance within thirty days. On July 28, 2016, the plaintiff filed a motion for default and nonsuit on the basis that the defendant had failed to comply with the court's June 27 order. The court granted the motion, finding that the '[p]laintiff is clearly prejudiced by these obstructive tactics and the only appropriate remedy proportionate to the infraction is default.' On September 26, 2016, the court rendered judgment for the plaintiff on its affirmative claims and against the defendant on his counterclaim.

"On September 27, 2016, the court [*Hon. Taggart D. Adams*, judge trial referee] held a hearing in damages. The plaintiff presented the testimony of Andrew Hertzmark, an employee of Generation; Christopher Culver, chief executive officer of the plaintiff; Taylor Henderson; and [the defendant]. At the conclusion of the hearing, the court requested posttrial briefing, which the parties submitted on October 18, 2016.

"On February 15, 2017, the court issued a memorandum of decision [2017 decision]. In its memorandum, the court reviewed the evidence presented during the [September 27, 2016] hearing in damages. From 2011 to 2013, the defendant was a consultant to the plaintiff, and the plaintiff compensated the defendant by making payments to his consulting company, St. Ives Development Group. On January 1, 2013, the defendant became

a full-time employee and chief revenue officer of the plaintiff. The plaintiff paid him a salary of over $12,000 per month, totaling $121,579.84 in 2013, and also paid him a sales target bonus of $25,000 in May, 2013. That bonus was paid to St. Ives Development Group. Just weeks after becoming a full-time employee of the plaintiff, the defendant communicated with Hertzmark, identifying the plaintiff as a possible investment target for his fund, and included the plaintiff's revenues and possible buyout price.

"In 2013, Hertzmark was working on a potential transaction in which Generation would acquire Captivate from Gannett Company, Inc. (Gannett). Both Captivate and the plaintiff are involved in the same business sector. While Captivate sells advertising space on digital monitors in elevators, the plaintiff sells advertising space on monitors located in hospitals and medical offices. Hertzmark testified that the defendant assisted with the Captivate acquisition, giving a presentation with Hertzmark to Gannett and helping formulate the letter of intent memorializing Generation's proposed purchase of Captivate. In March, 2013, Hertzmark e-mailed the defendant stating that Generation's letter of intent was not shared with the head of Captivate and, therefore, Gannett was surprised to learn that the head of Captivate was aware of plans to install the defendant as the new chief executive officer of Captivate once that business was acquired by Generation. In March and April, 2013, the defendant corresponded with Hertzmark regarding Captivate's attributes as an investment and reviewed due diligence information provided by Captivate from February through April, 2013. He told Hertzmark on July 6, 2013, that he wanted his attorney to review his Captivate employment contract once completed.

"The plaintiff terminated the defendant's employment on September 5, 2013, and Generation's acquisition of Captivate from Gannett closed on September 26, 2013. Upon the transaction's closing, the defendant was paid a finder's fee of $150,000, awarded a consulting contract with Captivate for three years at $50,000 annually, and given the opportunity to purchase restricted stock of Captivate.

"The court found that 'during the events in this case [the defendant] either never comprehended or ignored the different consequences of being a company employee and being a consultant,' referring to the defendant's testimony in which he described himself as a 'consultant employee' of the plaintiff. The court referenced the testimony of Culver, the plaintiff's chief executive officer, that the plaintiff's sales increased from $1.9 million in 2010 to $6.6 million in 2013. The court additionally noted Culver's testimony that the plaintiff 'held itself out to be the fastest growing company of its kind during this period' and his recognition that the

defendant was part of this 'terrific growth.' Crediting Culver's testimony, the court found that 'there was a sharp increase in the [plaintiff's] sales' while the defendant worked for the plaintiff.

"Turning to the plaintiff's claimed damages, the court first found that the plaintiff was not entitled to the defendant's 'compensation from Captivate' on the theory that the defendant usurped a corporate opportunity. Specifically, the court found that the opportunity the defendant took was 'employment' at Captivate, which was not an opportunity available to the plaintiff. The court determined, however, that damages were appropriate on the plaintiff's claim of the breach of fiduciary duty of loyalty, and measured the damages 'by the gain to the faithless employee.' The court awarded damages against the defendant in the total amount of $454,579.76, including $146,579.84, representing the defendant's 2013 salary ($121,579.84) and bonus ($25,000); $150,000, representing the finder's fee paid by Generation or Captivate [($150,000 finder's fee)]; $150,000, representing the consulting fees to be paid by Captivate from 2013 through 2016 [($150,000 consulting fees)]; and $7999.92, representing the value of the Captivate stock at the time of purchase.

"The court declined to award attorney's fees under CUTSA, finding that 'there was minimal or no misappropriation of trade secrets in this case, and no justifiable basis for awarding fees under that statute.' The court further declined to award attorney's fees as punitive damages under the common law, on the basis that the defendant 'has been penalized severely already by this court's decision. To add hundreds of thousands of dollars more, would not only be punitive, it would be overkill.' It additionally found that although the defendant's actions were 'uninformed, and even stupid,' his conduct did not meet the common-law standard for awarding attorney's fees, which, the court observed, requires that the conduct be 'outrageous, done with a bad motive, or with reckless indifference.' " (Footnote in original; footnotes omitted.) Id., 42–48. The court noted one exception to its determination that the defendant's conduct and behavior did not merit awarding common-law attorney's fees, which involved the defendant's "conscious and continuing obstruction of the ordinary discovery process in civil cases." The court underscored prior comments made by Judge Mottolese, including that the defendant's objections to the plaintiff's discovery requests were " 'without merit' . . . 'intentionally evasive and intended to obstruct the process,' " and that the defendant's conduct " 'demonstrate[d] hardened intransigence . . . .' " Observing that Judge Mottolese had indicated that the plaintiff could seek attorney's fees and costs if the defendant failed to comply with the plaintiff's discovery requests, the court awarded the plaintiff $21,922.50 in attorney's fees, which "represent[ed] the time the plaintiff's counsel

spent addressing the parties' discovery disputes."[4] *Hospital Media Network, LLC* v. *Henderson,* supra, 187 Conn. App. 48 n.11.

The defendant appealed from the judgment in the 2017 decision, claiming that the damages award was improper because the plaintiff had failed to offer proof of its damages.[5] Id., 48. On January 8, 2019, this court issued its opinion in *HMN*, reversing the judgment rendered against the defendant in the 2017 decision only as to damages. Id., 40, 60. In addressing the defendant's claim, this court first observed that, "[b]ecause of the default entered against the defendant, he [was] precluded from challenging his liability to the plaintiff under the claims pleaded"; id., 49; however, the defendant was "entitled . . . to challenge the determination of monetary relief awarded by the court." Id., 50. After providing an overview of our Supreme Court's decision in *Wall Systems, Inc.* v. *Pompa,* 324 Conn. 718, 154 A.3d 989 (2017), which was published after the 2017 decision and which "provided guidance on the equitable remedies available to an employer upon proving that an employee has breached his fiduciary duty of loyalty"; *Hospital Media Network, LLC* v. *Henderson,* supra, 187 Conn. App. 51; this court concluded "that the award of monetary relief [in the 2017 decision] was disproportionate to the misconduct at issue and failed to take into account the equities of the case at hand." Id., 54.

Turning first to the portion of the damages award requiring the defendant to forfeit his 2013 salary plus his sales bonus, totaling $146,579.84, this court stated that the trial court made factual findings that corresponded with the non-exhaustive list of factors delineated in *Wall Systems, Inc.,*[6] but that the court "ultimately failed to give proper weight to these findings in fashioning its damages award." Id., 56. This court noted that "the trial court expressly recognized the value of the services the defendant provided the plaintiff, finding 'a sharp increase in the [plaintiff's] sales' while the defendant worked for the plaintiff, and concluding that the defendant was part of this 'terrific growth.' That finding corresponds with the *Wall Systems, Inc.* factor prompting consideration of 'the effect of the disloyal acts on the value of the employee's properly performed services to the employer.' The court's finding, in essence a recognition that the defendant was providing extraordinary value to the plaintiff despite his breach of fiduciary duty, should have weighed in favor of a measured forfeiture, not the defendant's full salary and bonus." Id.

Next, this court stated that "the [trial] court also made a finding related to the wilfulness of the defendant's actions, another of the *Wall Systems, Inc.* factors. The court characterized the defendant's actions as 'uninformed, and even stupid.' By declining to award attorney's fees as punitive damages under the common law on this basis, it is evident that the court rejected any

notion that the defendant's conduct was 'outrageous, done with a bad motive, or with reckless indifference.' The court also found that the defendant had 'either never comprehended or ignored the different consequences of being a company employee and being a consultant,' referring to the defendant's testimony in which he described himself as a 'consultant employee' of the plaintiff. Despite recognizing that the defendant potentially 'never comprehended' the distinction between serving as an employee and a consultant and finding that the defendant's behavior was 'uninformed' rather than done with a bad motive, the court failed to give proper weight to these findings when fashioning its award." Id., 57–58. This court continued: "[T]he trial court's express factual findings reflect an uninformed employee who continued to provide significant value to his employer despite his breach of fiduciary duty. These findings, clearly not in the nature of corrupt or reprehensible behavior, should have weighed in favor of an award of something less than full forfeiture." Id., 58.

This court then noted, in reference to another *Wall Systems, Inc.* factor, that "forfeiture was not the sole remedy available to the [trial] court, as the court had before it evidence of the benefit the defendant received from third parties Generation and Captivate. . . . The court found those benefits . . . to amount to a total of \$307,99[9].92, and ordered disgorgement in full." (Citation omitted.) Id.

Turning to the portion of the damages award requiring the defendant to disgorge \$307,999.92, which comprised the \$150,000 finder's fee, the \$150,000 consulting fees, and the \$7999.92 value of the Captivate stock purchased by the defendant, this court determined that the disgorgement sum "appear[ed] to reflect compensation that the defendant had earned for consulting that he performed both prior to and subsequent to his nine month period of full-time employment with the plaintiff." Id., 58–59. This court stated that, "[t]o the extent the defendant rendered some of the services for which he was compensated by third parties both prior and subsequent to his full-time employment with the plaintiff, some commensurate portion of the compensation received in exchange for those services cannot be said to have been gained by the defendant's breach and should not have been included in the court's order of disgorgement." Id., 59.

In sum, this court concluded that, "[i]n fashioning its damage award [in the 2017 decision], the [trial] court failed to formulate a remedy appropriate to the particular circumstances of this case, in light of its own factual findings which weighed in favor of a measured award. Ultimately, the award of wholesale forfeiture and disgorgement in full failed to take into account the equities of the case at hand and did not achieve a just result."

Id., 60. Accordingly, this court reversed the judgment rendered against the defendant in the 2017 decision only as to the damages award and remanded the case for a new hearing in damages. Id.

Following this court's remand in *HMN*, the trial court, *Hon. Kenneth B. Povodator*, judge trial referee, held a new hearing in damages on September 10, 2019. At the outset of the hearing and without objection, the court indicated that it would consider the exhibits admitted during the September 27, 2016 hearing in damages as part of the record before it. In addition, without objection, the court admitted as a full exhibit a certified copy of the transcript of the September 27, 2016 hearing in damages. Culver, Taylor Henderson, and the defendant testified at the September 10, 2019 hearing in damages, and additional exhibits were admitted. On October 31, 2019, the parties filed posttrial briefs.

On February 25, 2020, the court issued a memorandum of decision rendering judgment in favor of the plaintiff in the amount of $323,545.84—$131,033.92 less than the damages awarded in the 2017 decision. This award represented (1) the defendant's forfeiture of (a) his 2013 salary in the amount of $121,579.84 and (b) $1966 in certain consulting fees paid by the plaintiff, and (2) the defendant's disgorgement of (a) the $150,000 finder's fee and (b) $50,000, constituting one year's worth of the $150,000 consulting fees.[7] This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

We first address the defendant's claim that the trial court exceeded the scope of this court's remand order in *HMN*. Specifically, the defendant asserts that, on remand, the court was bound by the factual findings made in the 2017 decision that were not challenged by the plaintiff in *HMN* by way of a cross appeal, such that the court committed error by "reopening and substantially revising" several of the factual findings set forth in the 2017 decision. Relatedly, the defendant contends that the court thus improperly "reweighed [equitable] factors that should have been locked into place." We disagree.

"We begin our analysis with the applicable standard of review. Determining the scope of a remand is a matter of law because it requires the trial court to undertake a legal interpretation of the higher court's mandate in light of that court's analysis. . . . Because a mandate defines the trial court's authority to proceed with the case on remand, determining the scope of a remand is akin to determining subject matter jurisdiction. . . . We have long held that because [a] determination regarding a trial court's subject matter jurisdiction is a question of law, our review is plenary. . . .

"At the outset, we note that, [i]f a judgment is set

aside on appeal, its effect is destroyed and the parties are in the same condition as before it was rendered. . . . As a result, [w]ell established principles govern further proceedings after a remand by this court. In carrying out a mandate of this court, the trial court is limited to the specific direction of the mandate as interpreted in light of the opinion. . . . This is the guiding principle that the trial court must observe. . . . It is the duty of the trial court on remand to comply strictly with the mandate of the appellate court according to its true intent and meaning. . . . The trial court should examine the mandate and the opinion of the reviewing court and proceed in conformity with the views expressed therein. . . .

"Compliance [with a mandate] means that the direction is not deviated from. The trial court cannot adjudicate rights and duties not within the scope of the remand. . . . No judgment other than that directed or permitted by the reviewing court may be rendered . . . . The trial court should examine the mandate and the opinion of the reviewing court and proceed in conformity with the views expressed therein." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Hurley* v. *Heart Physicians, P.C.*, 298 Conn. 371, 383–84, 3 A.3d 892 (2010).

Mindful of these principles, we turn to this court's opinion and remand order in *HMN*. As we detailed previously in this opinion, this court in *HMN* concluded that the damages award in the 2017 decision was improper because the trial court failed to weigh properly the equities in light of its factual findings. *Hospital Media Network, LLC* v. *Henderson*, supra, 187 Conn. App. 60. This court's remand order provided in relevant part that "[t]he judgment is reversed only as to the award of damages against [the defendant] and the case is remanded for a new hearing in damages . . . ." Id. On remand, the trial court conducted a new hearing in damages, hearing testimony from Culver, Taylor Henderson, and the defendant and admitting additional exhibits offered by the parties that supplemented the evidence adduced during the prior hearing in damages. Whereupon the court issued a decision in which it set forth findings of fact and, guided by the principles detailed in *Wall Systems, Inc.* v. *Pompa*, supra, 324 Conn. 718, awarded damages on the basis of its consideration of the equities in the case. See part II of this opinion.

We conclude that the trial court acted within the scope of this court's remand order in *HMN* by making its own, independent factual findings on the basis of the entire record before it and relying on those findings to assess the equities in the case. This court in *HMN* did not issue a circumscribed remand order that bound Judge Povodator to Judge Adams' factual findings in the 2017 decision; rather, it reversed the 2017 decision

as to the damages awarded against the defendant and remanded the case for a new hearing in damages. *Hospital Media Network, LLC* v. *Henderson*, supra, 187 Conn. App. 60. Nothing in *HMN* indicated that the hearing in damages on remand was to be limited in nature. Insofar as the 2017 decision awarded damages against the defendant, "its effect [was] destroyed and the parties [were] in the same condition as before it was rendered." (Internal quotation marks omitted.) *Hurley* v. *Heart Physicians, P.C.*, supra, 298 Conn. 383. In other words, following *HMN*, there were no factual findings from the 2017 decision that bound the trial court on remand in its determination of damages. Cf. *Fazio* v. *Fazio*, 199 Conn. App. 282, 287, 289–90, 235 A.3d 687 (trial court bound on remand by prior finding of cohabitation when that finding was not challenged in prior appeal and this court in prior appeal, rather than remanding for new trial, issued "limited remand" directing trial court " 'to determine the intent of the parties after consideration of all the available extrinsic evidence and the circumstances surrounding the entering of the [separation] agreement' "), cert. denied, 335 Conn. 963, 239 A.3d 1213 (2020). Moreover, given that the record on remand included additional evidence, it follows that the court necessarily made its own findings on the basis of the totality of the evidence in the record and, in light of those findings, considered the relevant equitable factors in determining damages.[8] Accordingly, the defendant's claim fails.

## II

The defendant next claims that the damages award on remand was improper because the trial court (1) made factual findings that were unsupported by the record and (2) improperly weighed the equities in the case. For the reasons that follow, we agree with the defendant that the court committed error, only insofar as the court ordered him to disgorge $50,000 of the $150,000 consulting fees.

We begin by setting forth the following applicable legal principles and standard of review. As our Supreme Court explained in *Wall Systems, Inc.* v. *Pompa*, supra, 324 Conn. 718, "[i]f an employer can prove an employee's breach of his or her duty of loyalty, there are a variety of remedies potentially available." Id., 732. These include the equitable remedies of forfeiture and disgorgement. Id., 729. As to disgorgement, "if an employee realizes a material benefit from a third party in connection with his breach of the duty of loyalty, the employee is subject to liability to deliver the benefit, its proceeds, or its value to the [employer]. . . . Accordingly, [a]n employee who breaches the fiduciary duty of loyalty may be required to disgorge any profit or benefit he received as a result of his disloyal activities, regardless of whether the employer has suffered a corresponding loss." (Citations omitted; internal quotation

marks omitted.) Id., 733.

"Additionally, an employer may seek forfeiture of its employee's compensation. . . . [Forfeiture] is derived from a principle of contract law: if the employee breaches the duty of loyalty at the heart of the employment relationship, he or she may be compelled to [forgo] the compensation earned during the period of disloyalty. The remedy is substantially rooted in the notion that compensation during a period in which the employee is disloyal is, in effect, unearned. . . . Forfeiture may be the only available remedy when it is difficult to prove that harm to [the employer] resulted from the [employee's] breach or when the [employee] realizes no profit from the breach. In many cases, forfeiture enables a remedy to be determined at a much lower cost to litigants. Forfeiture may also have a valuable deterrent effect because its availability signals [employees] that some adverse consequence will follow a breach of fiduciary duty. . . . Notably, however, even in cases in which a court orders forfeiture of compensation, the forfeiture normally is apportioned, that is, it is limited to the period of time during which the employee engaged in disloyal activity." (Citations omitted; internal quotation marks omitted.) Id., 733–34. "[W]hen imposing the remedy of forfeiture of compensation, depending on the circumstances, a trial court may in its discretion apply apportionment principles, rather than ordering a wholesale forfeiture that may be disproportionate to the misconduct at issue. . . . Conversely, the court may conclude that all compensation should be forfeited because the employee's unusually egregious or reprehensible conduct pervaded and corrupted the entire [employment] relationship." (Citation omitted; internal quotation marks omitted.) Id., 738; see also id., 734 n.11 ("[I]f an employee's disloyalty is confined to particular pay periods, so is the required forfeiture of compensation. . . . Conversely, if the compensation received by a disloyal employee is not apportioned to particular time periods or items of work, and his or her breach of the duty of loyalty is wilful and deliberate, forfeiture of his or her entire compensation may result." (Citations omitted; emphasis omitted.)).

Our Supreme Court emphasized that the remedies of forfeiture and disgorgement "are not mandatory upon the finding of a breach of the duty of loyalty, intentional or otherwise, but rather, are discretionary ones whose imposition is dependent upon the equities of the case at hand." Id., 729. "Generally speaking, equitable determinations that depend on the balancing of many factors are committed to the sound discretion of the trial court. . . . [C]ourts exercising their equitable powers are charged with formulating fair and practical remedies appropriate to the specific dispute. . . . In doing equity, [a] court has the power to adapt equitable remedies to the particular circumstances of each particular case. . . . [E]quitable discretion is not governed by

fixed principles and definite rules . . . . Rather, implicit therein is conscientious judgment directed by law and reason and looking to a just result." (Citations omitted; internal quotation marks omitted.) Id., 736.

In determining whether to invoke the remedies of forfeiture or disgorgement, "a trial court should consider all of the facts and circumstances of the case before it," including various factors enumerated by our Supreme Court insofar as they apply. Id., 737; see also footnote 6 of this opinion. "The several factors embrace broad considerations which must be weighed together and not mechanically applied. . . . [T]he judicial task is to search for a fair and reasonable solution in light of the relevant considerations . . . and to avoid unjust enrichment to either party." (Citations omitted; internal quotation marks omitted.) *Wall Systems*, *Inc.* v. *Pompa*, supra, 324 Conn. 738.

"As a general matter, [t]he trial court has broad discretion in determining whether damages are appropriate. . . . Its decision will not be disturbed on appeal absent a clear abuse of discretion. . . . Our review of the amounts of monetary awards rendered pursuant to various equitable doctrines is similarly deferential." (Internal quotation marks omitted.) *Hospital Media Network*, *LLC* v. *Henderson*, supra, 187 Conn. App. 51. "Although the determination of whether equitable doctrines are applicable in a particular case is a question of law subject to plenary review . . . the amount of damages awarded under such doctrines is a question for the trier of fact." (Citation omitted.) Id., 51 n.13. "With regard to the trial court's factual findings . . . the clearly erroneous standard of review is appropriate. . . . A factual finding is clearly erroneous when it is not supported by any evidence in the record or when there is evidence to support it, but the reviewing court is left with the definite and firm conviction that a mistake has been made." (Internal quotation marks omitted.) *Howard-Arnold*, *Inc.* v. *T.N.T. Realty*, *Inc.*, 145 Conn. App. 696, 717, 77 A.3d 165 (2013), aff'd, 315 Conn. 596, 109 A.3d 473 (2015).

In its decision on remand, the court found the following relevant facts and set forth the following reasoning in support of the damages award. The court observed that, with regard to the remand order in *HMN*, "[i]n stating that the goal should have been 'a measured award' and that the 'wholesale forfeiture and disgorgement in full' were improper, [this court], seemingly unambiguously, was sending a message that adjustments [to the damages awarded in the 2017 decision] were required . . . ." The court construed this court's "mandate [to be] to moderate the amount awarded using equitable principles" and further commented that this court had "directed [the trial court on remand] to award a more measured level of damages, taking into account work performed by the defendant

prior to his employment by the plaintiff and work performed by the defendant after termination of his employment and the work performed for the plaintiff." The court further noted that the record before it included the transcript of the September 27, 2016 hearing in damages, as well as the exhibits admitted at that hearing, as supplemented by the testimony and exhibits admitted during the September 10, 2019 hearing in damages.

At the outset of its analysis, the court stated that, during the September 10, 2019 hearing in damages, "[t]he defendant attempted to offer a large number of documents most of which counsel for the plaintiff claimed never to have seen before . . . . When the defendant proffered many of his exhibits during the . . . hearing, counsel for the plaintiff repeatedly stated that he had not seen the documents previously—the defendant did not challenge such characterizations, implicitly acknowledging that notwithstanding claims that the plaintiff already had access to all relevant documents because they were in the possession of the plaintiff, there were numerous documents that were not and would not have been in the plaintiff's possession. Indeed, after an early e-mail sent [by] the defendant [from] his e-mail address as an employee of the plaintiff, he asked [Hertzmark] to send all further e-mails to the defendant's personal e-mail address . . . indicating the conscious effort of the defendant to minimize usage of the plaintiff's e-mail system [(January 25, 2013 e-mail)]."[9] (Citations omitted.) The court further stated that this conduct by the defendant was "against a backdrop of the defendant having been defaulted for failing to comply with discovery obligations, such conduct eliciting characterizations of the defendant's behavior as 'hardened intransigence' and 'obstructive tactics' . . . ." (Citation omitted.) As the court explained, "[t]he point of this discussion is that the combination of the explicit comments of Judge Mottolese in earlier decisions on motions, leading to the entry of a default against the defendant (and a nonsuit as to [his counterclaim]), coupled with further indications of the existence of available potentially relevant materials not provided to the plaintiff prior to this latest hearing, indicate efforts to subvert the truth finding aspects of these proceedings while then claiming that the plaintiff has not produced sufficient evidence to warrant an award of damages."

Later in its decision, in applying the principles set forth in *Wall Systems, Inc.*, the court "identif[ied] a factor relatively unique to this case." The court explained: "In granting a default as to the plaintiff's claims and a nonsuit against the defendant on his [counterclaim], the court [*Hon. A. William Mottolese*, judge trial referee] characterized the defendant's approach to discovery as reflecting 'hardened intransigence' . . . . Later in that same order, the court concluded that 'the plaintiff is

clearly prejudiced by these obstructive tactics and the only appropriate remedy proportionate to the infraction is default.' This was after the court had characterized the defendant's objections to discovery requests in less than flattering terms: '[T]he objections are deemed intentionally evasive and intended to obstruct the process,' followed by what amounted to an invitation to the plaintiff to file an application for attorney's fees . . . .

"The extent to which the defendant was affirmatively disloyal or engaged in self-dealing, the extent to which he took and misused proprietary or confidential information, the extent to which he may have usurped corporate opportunities (or assisted other entities in usurping corporate opportunities), the extent to which he may have interfered with the plaintiff's business expectancies, all would require access to materials in the possession or control of the defendant. . . . Notwithstanding the defendant's nonproduction of [certain] documents [offered by the plaintiff during the September 27, 2016 hearing in damages], the plaintiff was able to obtain them at least in part due to fortuitous circumstances. . . . [T]here was at least one e-mail within his business account [the January 25, 2013 e-mail] both reflecting other ventures [the defendant was engaged in] and efforts made to conceal that type of activity. Further, the use of a personal e-mail account from the plaintiff's computers prevented the plaintiff from being able to view e-mails themselves, but attachments such as PDF documents, apparently by virtue of their status as attachments, were copied or otherwise preserved on the plaintiff's servers, and therefore could be viewed by the plaintiff. Therefore, the plaintiff had a very limited source of information directly available to it as to the defendant's activities but was able to obtain somewhat more complete information from Generation as to its interactions with the defendant, before, during and after his employment by the plaintiff. . . .

"The plaintiff, then, fortuitously had 'leads' relating to the defendant's continued interaction with Generation and especially the Captivate deal. Absent other such leads, however, the plaintiff would have no way of knowing the extent to which the defendant had used/misused his position or information available to him due to his position in manners detrimental to the plaintiff and/or benefiting the defendant. This is especially significant since the defendant has claimed that despite his having been hired as an employee of the plaintiff, he thought he was an employee-consultant and able to engage in other business ventures despite employment by the plaintiff.

"The court recognizes that the defendant already has been sanctioned for his failure to comply with disclosure obligations by virtue of the entry of a default and nonsuit. There remains, however, an asymmetry with respect to knowledge/information pertaining to dam-

ages. All of the information provided by the plaintiff with respect to its damages claims was known/knowable to the defendant—there were no surprises or potential claims of withholding of information by the plaintiff. The plaintiff, however, was only able to get limited meaningful disclosure through third parties and/or its own efforts—other activities that might have led to claims of wrongdoing with associated further disgorgement, information solely controlled by the defendant, remained unknown to the plaintiff. In effect, the defendant has limited the information available to the plaintiff concerning his wrongdoing, while able to cherry-pick information to be disclosed at trial that he deemed might be helpful. . . .

"This court, then, is concerned about the implications of allowing a defendant to restrict access to detrimental evidence relating to the extent of his wrongdoing and the extent of damages, while allowing him to ask for favorable equitable treatment based on favorable information he is able to proffer (here, the extent of sales he claims to have made). The court must decide this case, but cannot ignore potential implications of allowing an adverse party to have the ability to stymie the court's ability to make a meaningful and reasonably accurate determination of the damages which a party is entitled to recover." (Citations omitted.)

In light of this court's analysis in *HMN*, the trial court also addressed three specific topics: (1) the services that the defendant had provided to the plaintiff during his period of employment; (2) the defendant's efforts, prior to his employment with the plaintiff, to assist Generation in its acquisition of Captivate; and (3) the work performed by the defendant for Captivate after the plaintiff had terminated his employment. As to the services provided by the defendant as the plaintiff's employee, the court found that, although it was undisputed that the plaintiff's sales increased "substantially" while the defendant was employed by the plaintiff, "as [Culver] testified, it is unknown how much more growth there would have been had the [defendant] been devoting 100 percent of his time—as an employee should—to his employer's business rather than devoting unknown amounts of time to personal ventures. This is in the context of a business that was rapidly growing, and continued to grow even after the departure/termination of the [defendant]. Because of the clandestine manner in which the defendant operated, the plaintiff could not know whether the defendant had been engaged in projects other than (in addition to) the Captivate project that resulted in the $300,000 . . . that had been ordered [to be disgorged in the 2017 decision]." The court further stated that this court in *HMN* "took note of the fact . . . that the defendant had generated something in the area of $4 million in sales. Sales, of course, do not equate to profits. More importantly, it appears that the defendant hit his sales target for a [$25,000]

bonus in the first few months of employment (by April [2013])—given the overall annual sales of the [plaintiff] for the full year (under $7 million . . . ), there was nothing like that performance over the balance of his employment, suggesting something in the nature of diminishing performance (slacking off or being diverted by other activities?). Others in the company, and notably [Taylor Henderson] who no longer is in the case, also were involved in sales, which would have contributed to overall sales for the year. This is in a business that was experiencing growth in sales before the defendant's involvement and after his termination. . . . There is no doubt that [the defendant] provided services of value to the plaintiff during the time he was an employee, but there are questions as to whether the plaintiff was getting what it was paying for over the course of employment (especially after the first few months) and whether there was a betrayal of loyalties." (Citations omitted; footnote omitted.) The court further found that "[a] permissible inference confirming some level of slacking off can be drawn from the fact that [the defendant] hit his sales bonus target by April [2013] but the overall sales for the year for the [plaintiff] do not reflect that same kind of sales performance for the remaining four [to] five months that [his] employment continued."

Addressing the defendant's level of involvement in the Captivate deal before his employment with the plaintiff, the court found that, "[p]rior to employment by the plaintiff, the defendant's role with respect to Captivate and Generation was as a finder. There was evidence that there had been prior unsuccessful attempts at bringing those two entities together, as well as efforts by the defendant to bring other investment opportunities to the attention of Generation.

"As the court understands it, as a finder, the defendant was acting in a capacity analogous to that of a real estate broker—no compensation is earned with respect to unsuccessful prospects, no matter how much effort is expended. Only when a deal is brought to fruition—in the case of a real estate sale, typically it is obtaining a ready, willing and able buyer as memorialized in a signed contract (rather than the actual closing)—is a commission or finder's fee 'earned.' Thus, while the final dotting of i's and crossing of t's may not be necessary to earn compensation as a finder, a near final if not final deal in terms of obligations is required before any money is earned; unsuccessful efforts, no matter how extensive, do not result in any compensation.

"From this perspective, the court concludes that there was no evidence much less credible evidence that the defendant had rendered consulting services to Generation or Captivate, prior to 2013, for which he was entitled to compensation. There was no evidence or suggestion that any compensation was due or payable

to the defendant relating to Captivate (or other equity investment opportunities for Generation), absent an actual agreement. Specifically relating to the Captivate deal, there may have been some initial/preliminary work in late December, 2012, but the real work of putting together the framework for a deal appears to have taken place over the course of the first six months or so of 2013, as reflected by the limited documentation available to the plaintiff (despite the defendant's discovery noncooperation), and the testimony of . . . Hertzmark. While a very tentative deal may have been reached earlier, the earliest document presented to the court suggesting a near final deal was [defendant's] exhibit I, dated June, 2013."[10] (Footnotes omitted.)

The court further found that the defendant spent time working on the Captivate deal in February through April, 2013. Specifically, the court found that (1) in March and April, 2013, the defendant responded to certain questions posed by Hertzmark concerning Captivate's "attractiveness as an investment," and (2) the defendant reviewed due diligence information from Captivate from February through April, 2013. (Internal quotation marks omitted.) Additionally, the court found that the defendant sent an e-mail to Hertzmark dated July 6, 2013, writing in relevant part: "[W]hen you have my contract completed, I would like to have my attorney review it . . . ." (Internal quotation marks omitted.) The court observed that, at that time, there was official documentation reflecting that the defendant was going to be named the chief executive officer of Captivate. On the basis of "all of the available evidence, the court [could not] conclude that there was any substantial compensable work performed by the defendant, relating to the Captivate transaction, prior to his becoming employed by the plaintiff; virtually all of the work relating to that deal occurred during his tenure with the plaintiff." Moreover, the court discredited testimony by the defendant "to the effect that most of the work on the Captivate project requiring input from him had been completed prior to his hire date of January 1, 2013."

With respect to the defendant's activity after his employment was terminated by the plaintiff, the court described the evidence as "also sketchy—perhaps sketchier." The court found that "[t]here was evidence that the defendant was to be paid $50,000 a year for three years by Captivate for consulting services, but the court does not recall any evidence that any substantial work actually was performed in that regard. Context, again, is important. There was evidence . . . that the defendant was to become the chief executive officer of Captivate, once the [Captivate] deal was consummated. The defendant did not become [chief executive officer] of Captivate, and he testified that he really had not wanted that position. He acknowledged that he was aware of that designation being a part of the documentation for the deal, that there could be regulatory conse-

quences for erroneous or misleading information, but that he did nothing to correct the claimed misinformation being disseminated. The court does not find this retrospective denial of interest credible.

"Because of that lack of credibility of denial of interest, the court is concerned that the consulting agreement for the postconsummation period might have been something other than a consulting agreement—possibly compensation for him not being designated [chief executive officer], or possibly a part of the finder's fee paid out over time. Again, the court does not recall any substantial much less credible evidence of what the defendant actually did to earn those posttermination consulting fees.

"The problem is that the court cannot speculate and there is no affirmative evidence of either alternate scenario. Again, this circles back to the fact that the defendant impeded—apparently stonewalled—discovery, making a proof of any contention favorable to the plaintiff difficult if not impossible. This is especially of concern in the first year after severance, particularly to the extent the plaintiff contended that the defendant took and used confidential/proprietary information," which was deemed admitted by virtue of the defendant's default. (Footnote omitted.) Such information "would have been of most value in that first year after termination by the plaintiff. Although the plaintiff could provide no proof of damages, the defendant was defaulted such that liability for all of the claims asserted is deemed admitted, including especially the claimed violation of [CUTSA], as well as other claims that were deemed admitted that potentially implicated use of internal information, e.g., tortious interference with contract."

The court proceeded to consider several of the factors expressly set forth in *Wall Systems*, *Inc.* Of import, the court found that, with respect to Generation and Captivate, the defendant's disloyal acts "appear[ed] to have been essentially continuous from the start of his employment until termination, with the actual frequency seemingly moderate," and were conducted with "wilfulness in the sense of the conduct being intentional as opposed to inadvertent." The court further found that, although the defendant claimed to believe that his employment with the plaintiff was "in the nature of a consultant on a nonexclusive basis," his directive to Hertzmark to send correspondence to his personal e-mail rather than to his business e-mail "seems to indicate knowledge of impropriety in using the [plaintiff's] e-mail and server for nonemployer business—in turn suggesting knowledge that the conduct itself was improper." In addition, in analyzing most of the otherwise applicable *Wall Systems*, *Inc.* factors, the court observed that there was "limited reliable information" available to assess the factors "in large measure due to the defendant's noncompliance with discovery."

At the end of its decision, the court determined that "[t]he claims upon which relief has been awarded allow remedies in the nature of disgorgement and forfeiture, and the various factors/considerations set forth in *Wall Systems*, [*Inc.*] point in varying degrees in favor of equitable relief of that nature." The court summarized its reasoning for each component of the $323,545.84 damages award as follows.

In ordering forfeiture of the defendant's 2013 salary and the $1966 in consulting fees paid by the plaintiff, the court stated that it "believes that the defendant's violation of his fiduciary duty to his employer, coupled with the discovery noncompliance precluding the determination of the actual bounds of any improprieties, warrants full forfeiture of his 'regular' pay from the plaintiff.[11] The court has made an exception for the [$25,000 sales] bonus. The bonus was a focused target for sales, and in that narrow respect, the plaintiff got precisely what it had asked for in exchange for the payment of $25,000—the [defendant], relatively quickly, met the required target. While the sales may have been 'low hanging fruit' or consummation of sales to already identified customers, the court believes that that is an appropriate adjustment with respect to compensation by the plaintiff." (Footnote added.)

Next, in ordering disgorgement of the $150,000 finder's fee, the court explained: "With respect to Captivate and the Captivate/Generation deal, the court already noted that as a finder, efforts made in prior years that did not lead to a final agreement were not apparently entitled to any compensation, by the very nature of the work. A finder's fee was only earned when a prospective acquisition became an actual acquisition (at least in a binding agreement/commitment sense). Virtually all of the work relating to the eventual Captivate/Generation deal occurred in 2013, with only a sliver of activity having been identified as possibly occurring in late December, 2012." The court continued: "Because of the nature of a finder's fee, the court does not believe that there was any substantial work performed by the defendant, relating to the eventual Captivate/Generation deal, prior to commencement of employment in January, 2013. There is no reason to believe that unsuccessful efforts years earlier have any material bearing on the eventual transaction. Any work that might have been done in late December [2012] would have been relatively preliminary and there was no credible evidence that anything that might have been done in that short (holiday) time frame was substantial. . . . The court finds not credible the protestations of the defendant that his conduct in 2013 relating to the acquisition of Captivate by Generation was minimal and not substantive. Therefore, the court has no hesitation about requiring disgorgement of the full [$150,000] finder's fee."

Finally, in ordering disgorgement of $50,000 of the

$150,000 consulting fees, the court explained: "The court already has expressed its reservations as to whether the consulting agreement truly was a consulting agreement as opposed to a form of additional compensation either as a tail for the finder's fee or as compensation for the defendant not being made the [chief executive officer] of Captivate. Absent evidence in that regard, however, the court cannot act on such concerns. Therefore, consistent with [this court's mandate in *HMN*] for a more measured approach to damages, the court believes that at a minimum, the first year of consulting fees should be forfeited. The very fact that he was awarded a consulting agreement with Captivate was a consequence of the activities undertaken and performed largely if not exclusively during the course of employment by the plaintiff. In other words, even if the defendant actually performed consulting services, the initiation of the relationship was attributable to his conduct while an employee of the plaintiff; at least the first year has a sufficient nexus to the employment by the plaintiff that the first year's consulting fee should be forfeited." The court continued: "But for the fact that the defendant had been instrumental in consummating the Captivate-Generation acquisition deal, it is highly unlikely that he would have obtained a three year consulting agreement at $50,000 per year. In other words, even if he actually did consulting work during those three years that might warrant such payments—and there was no credible evidence in that regard—it is extremely unlikely that he would have obtained such a long-term agreement but for his role as a 'finder' (if not as a consolation for him not being appointed [chief executive officer]). Under these circumstances, the court believes it to be equitable to require forfeiture of compensation for that first year of consulting services due to its nexus (both causally and temporally) with the earned [$150,000] finder's fee, but consistent with the directive to take into account work performed by the defendant after termination of employment, to allow him to retain the second and third years' compensation."

## A

We first address the defendant's claim that the court made certain factual findings that were unsupported by the record. Specifically, the defendant contends that the court clearly erred in finding that (1) he did not perform substantial work prior to his employment with the plaintiff, which began on January 1, 2013, that entitled him to the $150,000 finder's fee, and (2) during the September 10, 2019 hearing in damages, he attempted to offer into evidence numerous exhibits that the plaintiff's counsel had not seen before. We analyze each finding in turn.

### 1

The defendant contends that the court clearly erred

in finding that he did not perform substantial work before being hired by the plaintiff in 2013 that entitled him to the $150,000 finder's fee. In support of his argument, the defendant relies primarily on testimony by Hertzmark, as reflected in the transcript of the September 27, 2016 hearing in damages, which was admitted as a full exhibit.[12] The defendant posits that the court on remand "generally credited" Hertzmark's testimony. This contention is unavailing.

Hertzmark provided inconsistent testimony as to whether the defendant earned the $150,000 finder's fee by providing services before he was employed by the plaintiff. Some of Hertzmark's testimony suggested that the defendant earned the $150,000 finder's fee strictly for work that he had completed in 2013 while employed by the plaintiff. Hertzmark testified that, during that time, the defendant provided information and advice to him about Captivate, prepared a financial model, assisted in the formulation of a letter of intent, and helped make a presentation. When asked whether it was "accurate that in 2013 [the defendant] earned compensation with respect to the Captivate transaction," whether the defendant "receive[d] cash compensation [in the form of the $150,000 finder's fee] for the work that he did in 2013 . . . for [the Captivate] transaction," and whether it was "accurate that relative to the work that [the defendant] did in connection with the Captivate/Generation transaction . . . in 2013, [the defendant] got [the $150,000 finder's fee]," Hertzmark answered in the affirmative.

In contrast, other portions of Hertzmark's testimony indicated that the defendant performed services before being hired by the plaintiff in 2013 that entitled him to the $150,000 finder's fee. Hertzmark testified that, "during the course of several years, [the defendant] and I . . . looked at a number of companies, thirty-five, thirty different companies, and ultimately settled in 2013 on Captivate. So . . . what you're hearing about with Captivate was the tail end of the relationship." Hertzmark further testified that "2013 was not the first time we approached and wrote a letter of intent to acquire Captivate." When asked whether "the arrangement that you had . . . with [the defendant] . . . dating back to 2010, 2011 [was] that when and if [the Captivate deal] closed, [the defendant] would be paid a finder's fee," Hertzmark answered affirmatively. Hertzmark further agreed with the statement that the defendant was "instrumental . . . in the initial introduction and development of [the Captivate deal] back to 2010, 2011, or when he was a consultant." In addition, when asked whether he would have paid the defendant the $150,000 finder's fee had he known that the defendant was a full-time employee of the plaintiff, Hertzmark testified that "we would have paid [the defendant] the . . . cash compensation [in the form of the $150,000 finder's fee] regardless of [the defendant's] employment

because [the defendant] had made the introduction many years ago" and the defendant had "performed some of the services in 2013."

"It is well established that, even if there are inconsistencies in a witness' testimony, [i]t is the exclusive province of the trier of fact to weigh conflicting testimony and make determinations of credibility, crediting some, all or none of any given witness' testimony. . . . It is not our role to reevaluate the credibility of witnesses or to overturn factual findings of a [trial] court unless they are clearly erroneous. . . . If there is any reasonable way that the [trier of fact] might have reconciled the conflicting testimony before [it], we may not disturb [its] [credibility determination]." (Citations omitted; internal quotation marks omitted.) *Wall Systems, Inc.* v. *Pompa*, supra, 324 Conn. 741. Moreover, a trier of fact is "free to credit one version of events over the other, even from the same witnesses." *Parker* v. *Slosberg*, 73 Conn. App. 254, 265, 808 A.2d 351 (2002).

In light of the foregoing principles, we conclude that the record supports the court's finding that the defendant did not perform any substantial services, prior to his employment with the plaintiff in 2013, entitling him to the $150,000 finder's fee. Portions of Hertzmark's testimony indicate that the defendant earned the $150,000 finder's fee solely on the basis of efforts that he made in 2013 while he was employed by the plaintiff. Although other portions of Hertzmark's testimony may support an opposite finding, the court was free to resolve that inconsistency by crediting only the portions of Hertzmark's testimony buttressing its finding.[13] Additionally, it is notable that the court expressly discredited the defendant's testimony that the majority of his work on the Captivate deal had been completed before he began his employment with the plaintiff, further indicating that the court deemed substantively similar testimony by Hertzmark to be incredible. Thus, we conclude that the court's finding was not clearly erroneous.[14]

2

The defendant also contends that the court clearly erred in finding that he attempted to offer into evidence numerous exhibits that the plaintiff's counsel had not seen previously. Although we agree that the record does not support this finding, we conclude that the court's error is harmless.

During the hearing on remand, the defendant offered more than a dozen additional exhibits into evidence, only two of which were admitted as full exhibits. The plaintiff's counsel objected to the admission of nearly all of the defendant's exhibits; however, counsel's objections were not based on representations that the documents had not been previously produced. With regard to defendant's exhibit D, a 2011 e-mail from the defendant to Hertzmark that was marked for identifica-

tion only, the plaintiff's counsel indicated on the record that he had seen the exhibit for the first time that day; however, counsel did not comment further on that topic, and he objected to the admission of the exhibit for lack of a proper foundation. The record does not reflect protestations by the plaintiff's counsel that he had not seen any of the other exhibits offered by the defendant. Accordingly, insofar as the court found that the defendant sought to introduce "many" or a "large number" of exhibits that the plaintiff's counsel had not seen prior to the hearing on remand, that finding is not supported by the record.

Our conclusion that the court's finding was clearly erroneous does not end our inquiry. "[W]here . . . some of the facts found [by the trial court] are clearly erroneous and others are supported by the evidence, we must examine the clearly erroneous findings to see whether they were harmless, not only in isolation, but also taken as a whole. . . . If, when taken as a whole, they undermine appellate confidence in the court's [fact-finding] process, a new hearing is required." (Internal quotation marks omitted.) *Autry* v. *Hosey*, 200 Conn. App. 795, 801, 239 A.3d 381 (2020).

The defendant posits that the court's unsupported finding factored heavily in its determination of damages. We disagree. Throughout its decision, the court repeatedly referenced the defendant's discovery violations that led, inter alia, to his default as to liability. The defendant's noncompliance with discovery is separate and distinct from his purported transgression found by the court to have occurred during the hearing on remand. At most, the court's belief that the defendant engaged in malfeasance during the hearing on remand amplified its concern, predicated on the defendant's discovery violations, about the "potential implications of allowing an adverse party to have the ability to stymie the court's ability to make a meaningful and reasonably accurate determination of the damages which a party is entitled to recover." The court's unsupported finding does not "undermine appellate confidence in the court's [fact-finding] process"; (internal quotation marks omitted) *Autry* v. *Hosey*, supra, 200 Conn. App. 801; and, accordingly, we conclude that the court's clearly erroneous finding is harmless.

B

We turn to the defendant's remaining claim that the court on remand abused its discretion in determining damages because the court failed to properly weigh the equities. On the basis of his appellate briefs, we distill the defendant's claims as (1) raising a specific claim of error as to the portion of the damages award ordering disgorgement of $50,000 of the $150,000 consulting fees and (2) challenging the damages award globally. First, as to the disgorgement of $50,000 of the $150,000 consulting fees, the defendant asserts that the court

ordered disgorgement notwithstanding the plaintiff's failure to meet its burden to demonstrate that there was a link connecting all or some of the $150,000 consulting fees to the defendant's work on the Captivate deal in 2013, as instructed by this court in *HMN*. Second, the defendant contends that the damages award as a whole was inequitable because (1) the court failed to consider properly the undisputed fact that he had provided significant value to the plaintiff during his period of employment, (2) the court ignored the finding by the trial court in the 2017 decision, as recognized by this court in *HMN*, that his conduct was "uninformed," as opposed to undertaken with "a bad motive," and was "clearly not in the nature of corrupt or reprehensible behavior," (3) the court improperly weighed his noncompliance with discovery against him notwithstanding that he had been sanctioned previously for his discovery violations, and (4) the damages award resulted in the plaintiff being unjustly enriched. (Internal quotation marks omitted.) We address each of these arguments in turn.

1

The defendant asserts that the court committed error in ordering him to disgorge $50,000 of the $150,000 consulting fees. Specifically, the defendant argues that, under the rationale of *HMN*, the plaintiff failed to meet its burden to establish that the $50,000 amount was earned for work performed by the defendant to advance the Captivate deal in 2013, as opposed to compensation for posttermination services provided by him to Captivate. We agree.[15]

In *HMN*, this court stated that, "[t]o the extent the defendant rendered some of the services for which he was compensated by third parties both prior and subsequent to his full-time employment with the plaintiff, some commensurate portion of the compensation received in exchange for those services cannot be said to have been gained by the defendant's breach and should not have been included in the court's order of disgorgement." *Hospital Media Network, LLC* v. *Henderson*, supra, 187 Conn. App. 59. In a footnote, this court further indicated that there was a distinction between (1) the defendant earning the $150,000 consulting fees for performing services for Captivate after his employment with the plaintiff had been terminated and (2) the defendant being offered the opportunity to earn the $150,000 consulting fees as a result of his work on the Captivate deal in 2013. See id., 59 n.15 ("although [the defendant] was provided the opportunity to sign the agreement [with Captivate] as a consultant on the basis of his work in 2013, he performed the services specified in the agreement and earned the $50,000 per year subsequent to the termination of his employment with the plaintiff").

On remand, the court found that there was no credi-

ble evidence that the defendant performed any posttermination consulting work for Captivate to earn the $150,000 consulting fees. The court also was "concerned" and had "reservations" about the true nature of the $150,000 consulting fees, questioning whether they may have constituted a "tail" to the $150,000 finder's fee or a "consolation" in lieu of the defendant being named chief executive officer of Captivate; however, "[a]bsent evidence in that regard," the court determined that it "[could not] act on such concerns." Ultimately, the court found that, even assuming that there was credible evidence that the defendant earned the entirety of the $150,000 consulting fees for services he performed for Captivate following the termination of his employment with the plaintiff, there was a causal and temporal link between the defendant's work on the Captivate deal in 2013 and the $150,000 consulting fees, and, on the basis of that finding, the court determined that it was equitable to order disgorgement of $50,000 of the $150,000 consulting fees (that is, one year's worth of the fees).

As the defendant correctly sets forth in his principal appellate brief, under *HMN*, the court was not permitted on remand to order disgorgement of compensation earned by the defendant outside of his period of employment with the plaintiff. Although the defendant had been defaulted as to liability, it remained the plaintiff's burden to demonstrate that the $150,000 consulting fees, in whole or in part, were earned for work performed by the defendant on the Captivate deal in 2013. See *Hospital Media Network, LLC* v. *Henderson*, supra, 187 Conn. App. 50 ("The limit of [the effect of a default] is to preclude the defaulted defendant from making any further defense and to permit the entry of a judgment against him on the theory that he has admitted such of the facts alleged in the complaint as are essential to such a judgment. It does not follow that the plaintiff is entitled to a judgment for the full amount of the relief claimed. *The plaintiff must still prove how much of the judgment prayed for in the complaint he is entitled to receive.*" (Emphasis in original; internal quotation marks omitted.)). The court's decision reflects that the plaintiff did not meet its burden, as the court found that, notwithstanding its concerns regarding their true nature, there was no credible evidence establishing that the $150,000 consulting fees were earned for services performed while the defendant was employed by the plaintiff.[16] Moreover, the court's reasoning for ordering disgorgement of $50,000 was predicated on the assumption that the defendant had earned the $150,000 consulting fees for services performed for Captivate after his employment with the plaintiff had ended. In light of the prohibition in *HMN* against ordering disgorgement of amounts earned before or after the termination of the defendant's employment with the plaintiff, the court's reasoning is untenable. For these reasons,

we conclude that the court improperly ordered disgorgement of $50,000 of the $150,000 consulting fees.

2

The defendant next raises several arguments challenging the damages award as a whole. None of these arguments is persuasive.

First, we reject the defendant's argument that the court did not properly consider the significant value of his services to the plaintiff as its employee. The court found that the plaintiff's sales increased "substantially" during the defendant's employment and that "[t]here is no doubt that [the defendant] provided services of value to the plaintiff during the time he was an employee . . . ." In a vacuum, those findings would weigh against the wholesale forfeiture of an employee's salary or the wholesale disgorgement of third-party benefits received by the employee. Within its discretion, however, the court weighed those findings against a myriad of other facts that it found, including its finding that the defendant's sales performance decreased during the latter part of his employment, which, as the court reasonably inferred, stemmed from the defendant's involvement in activities unrelated to his employment with the plaintiff,[17] and which the court found raised "questions as to whether the plaintiff was getting what it was paying for over the course of employment . . . ." We perceive no abuse of the court's discretion in its balancing of these facts.

Next, in arguing that the damages award was inequitable, the defendant relies on the trial court's finding in the 2017 decision that his conduct was "uninformed" rather than "done with bad motive" or in the "nature of corrupt or reprehensible behavior." (Internal quotation marks omitted.) This reliance is misplaced. As we explained in part I of this opinion, the findings in the 2017 decision supporting the prior damages award against the defendant were not binding on the trial court on remand. In its decision on remand, the court found that the defendant acted wilfully "in the sense of the conduct being intentional as opposed to inadvertent" and that, although the defendant claimed to believe that he "still was operating as something in the nature of a consultant on a nonexclusive basis," the January 25, 2013 e-mail "indicate[d] knowledge of impropriety in using the [plaintiff's] e-mail and server for nonemployer business—in turn suggesting knowledge that the conduct itself was improper." Additionally, the court found that the defendant's disloyal acts "appear[ed] to have been essentially continuous from the start of his employment until termination, with the actual frequency seemingly moderate." The court was not precluded from making these findings, which are supported by the record, and relying on them to issue its damages award. Indeed, such findings fall squarely within the following guidance set forth in *Wall Systems*,

*Inc.* v. *Pompa*, supra, 324 Conn. 718: "[I]f an employee's disloyalty is confined to particular pay periods, so is the required forfeiture of compensation. . . . *Conversely, if the compensation received by a disloyal employee is not apportioned to particular time periods or items of work, and his or her breach of the duty of loyalty is wilful and deliberate, forfeiture of his or her entire compensation may result.*" (Citations omitted; emphasis altered.) Id., 734 n.11.

The defendant also argues that the court improperly weighed his noncompliance with discovery against him because he was penalized previously for his discovery violations by way of the trial court defaulting him as to liability on the plaintiff's claims, nonsuiting his counterclaim, and awarding the plaintiff $21,922.50 in attorney's fees. We are not persuaded. Simply stated, there is no suggestion in the court's decision that it used the defendant's discovery violations to supplant the plaintiff's burden to demonstrate its damages. Rather, the court's observations concerning the defendant's discovery failures reflect its determination that such failures should weigh against the defendant's requests for more favorable equitable treatment. See, e.g., *Certo* v. *Fink*, 140 Conn. App. 740, 743, 749–50, 60 A.3d 372 (2013) (concluding that, in determining damages, trial court did not commit error in relying on plaintiffs' estimate of damages when court credited plaintiffs, discredited defendant, and found that plaintiffs had to rely on estimate of damages as result of defendant's failure to provide discovery). We find no error in this regard.

Finally, the defendant argues that the damages award unjustly enriched the plaintiff because it enabled the plaintiff to recoup the sums ordered to be forfeited and to obtain the third-party benefits ordered to be disgorged while keeping the millions in dollars of revenue that the plaintiff earned during his employment, along with other benefits of his labor, as well as the $21,922.50 in attorney's fees previously awarded. See *Wall Systems, Inc.* v. *Pompa*, supra, 324 Conn. 738 ("[t]he judicial task [in applying the remedies of forfeiture and disgorgement] is to search for a fair and reasonable solution in light of the relevant considerations . . . and to avoid unjust enrichment to either party" (citation omitted; internal quotation marks omitted)). This assertion is unavailing. The defendant overlooks the court's findings that, notwithstanding the value that he provided to the plaintiff, his sales performance decreased during the latter part of his employment, and it was "unknown how much more growth there would have been had the [defendant] been devoting 100 percent of his time—as an employee should—to [the plaintiff's] business rather than devoting unknown amounts of time to personal ventures. This is in the context of a business that was rapidly growing, and continued to grow even after the departure/termination of the [defendant]." Under these circumstances, we do not agree

that the plaintiff was unjustly enriched.

In sum, except for the court's ordering disgorgement of $50,000 of the $150,000 consulting fees, we conclude that the court balanced the equities and properly utilized the equitable remedies of forfeiture and disgorgement in this case. Accordingly, we further conclude that, other than the court's ordering disgorgement of $50,000, the court did not abuse its discretion in awarding damages.

The judgment is reversed in part and the case is remanded with direction to vacate the damages award insofar as the court ordered the defendant to disgorge $50,000 of the $150,000 consulting fees; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The plaintiff's complaint also named Taylor Henderson as a defendant. A judgment was rendered against Taylor Henderson, upon default as to liability, in the amount of $2000, which was not challenged on appeal in *HMN* and which has been fully satisfied. See *Hospital Media Network, LLC* v. *Henderson*, supra, 187 Conn. App. 42 n.1. For the sake of simplicity, we refer in this opinion to James G. Henderson as the defendant.

[2] For ease of reference, we address the defendant's claims in a different order than they are presented in his principal appellate brief.

[3] "Although the plaintiff alleged breach of the duty of employee loyalty separate from its claim of breach of fiduciary duty, it specified in its breach of fiduciary duty count that one such fiduciary duty breached was the duty of loyalty. In its memorandum of decision [awarding the damages at issue in the prior appeal], the court awarded damages for 'breach of fiduciary duty owed to the corporation' and cited case law and secondary sources addressing the fiduciary duty of loyalty. Our Supreme Court likewise has treated the duty of loyalty as a fiduciary duty in the employment context. See *Wall Systems, Inc.* v. *Pompa*, 324 Conn. 718, 733, 154 A.3d 989 (2017)." *Hospital Media Network, LLC* v. *Henderson*, supra, 187 Conn. App. 42–43 n.2.

[4] The defendant did not appeal from the attorney's fees award in *HMN*. See *Hospital Media Network, LLC* v. *Henderson*, supra, 187 Conn. App. 48 n.11. In his principal appellate brief, the defendant represents that the attorney's fees award has been satisfied.

[5] "[T]he plaintiff [did] not cross [appeal] from the [trial] court's refusal to award damages on the claims alleging a violation of CUTSA, tortious interference with the plaintiff's business and contractual relations, breach of the duty of employee loyalty, and usurpation of corporate opportunities." *Hospital Media Network, LLC* v. *Henderson*, supra, 187 Conn. App. 44 n.3.

[6] The factors enumerated in *Wall Systems, Inc.*, which our Supreme Court "gleaned from existing jurisprudence" and which were "not intended to be exhaustive"; *Wall Systems, Inc.* v. *Pompa*, supra, 324 Conn. 737; are as follows: "[T]he employee's position, duties and degree of responsibility with the employer; the level of compensation that the employee receives from the employer; the frequency, timing and egregiousness of the employee's disloyal acts; the wilfulness of the disloyal acts; the extent or degree of the employer's knowledge of the employee's disloyal acts; the effect of the disloyal acts on the value of the employee's properly performed services to the employer; the potential for harm, or actual harm, to the employer's business as a result of the disloyal acts; the degree of planning taken by the employee to undermine the employer; and the adequacy of other available remedies . . . ." Id.

[7] Relative to the $454,579.76 in damages awarded in the 2017 decision, the defendant retained on remand his $25,000 sales bonus and $100,000 of the $150,000 consulting fees; however, the court on remand ordered forfeiture of $1966 in the consulting fees paid by the plaintiff, which were not included in the damages award in the 2017 decision. Additionally, on remand, the plaintiff did not seek disgorgement of the $7999.92 in Captivate stock that the defendant had purchased, which had been ordered disgorged in the 2017 decision.

[8] We recognize that, "[i]n Connecticut, we follow the [well recognized] principle of law that the opinion of an appellate court, so far as it is applicable,

establishes the law of the case upon a retrial, and is equally obligatory upon the parties to the action and upon the trial court. . . . The rule is that a determination once made will be treated as correct throughout all subsequent stages of the proceeding except when the question comes before a higher court . . . and applies . . . to remands for new trial . . . ." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *Behrns* v. *Behrns*, 124 Conn. App. 794, 815, 6 A.3d 184 (2010). We also recognize that "[i]t is the function of the trial court, not [an appellate] court, to find facts. . . . Imposing a fact-finding function on this court, therefore, would be contrary to generally established law. Indeed, it would be inconsistent with the entire process of trial fact-finding for an appellate court to do so." (Citation omitted; internal quotation marks omitted.) *Miller* v. *Westport*, 268 Conn. 207, 221, 842 A.2d 558 (2004). Thus, on remand, the trial court was bound by this court's determination in *HMN* that the damages award in the 2017 decision constituted an abuse of discretion, in addition to any legal precepts set forth in *HMN*; however, this court did not direct the trial court to make any particular factual findings or otherwise restrain the trial court's fact-finding ability on remand.

[9] The January 25, 2013 e-mail was admitted as a full exhibit.

[10] Exhibit I is an investment memorandum prepared by Generation regarding Captivate.

[11] The court's reference to " 'regular' pay" suggests that the court was addressing only the forfeiture of the defendant's 2013 salary, totaling $121,579.84, and making no mention of the $1966 in consulting fees that the court also ordered to be forfeited. Later in its decision, in discussing its forfeiture order, the court stated that it "believes that the compensation received from the plaintiff properly should be forfeited. The one exception is that . . . the $25,000 performance bonus should be allowed . . . ." Thus, we construe the court's reasoning to encompass the forfeiture of both the defendant's 2013 salary and the $1966 in consulting fees paid by the plaintiff.

[12] Hertzmark did not testify in person at the September 10, 2019 hearing in damages.

[13] In *HMN*, in a portion of a footnote to its statement that the amount ordered to be disgorged in the 2017 decision "appear[ed] to reflect compensation that the defendant had earned for consulting that he performed both prior to and subsequent to his nine month period of full-time employment with the plaintiff"; *Hospital Media Network, LLC* v. *Henderson*, supra, 187 Conn. App. 58–59; this court detailed the testimony by Hertzmark indicating that the defendant had performed work on the Captivate deal prior to 2013. Id., 59 n.15. The relevant portion of that footnote should not be construed as this court making factual findings or intruding on the trial court's fact-finding function on remand; see footnote 8 of this opinion; rather, it should be read through the lens that this court in *HMN* was reviewing Judge Adams' damages award in the 2017 decision, which was predicated on the record before Judge Adams at that time.

[14] In addition to relying on Hertzmark's testimony in support of his argument, the defendant makes a passing reference to plaintiff's exhibit 20, which was admitted as a full exhibit and which is composed of a thread of e-mails reflecting communications, dating back to December 27, 2012, involving the defendant, Hertzmark, and/or a Gannett representative concerning Captivate. The defendant characterizes exhibit 20 as "show[ing] that substantial negotiations and communications regarding the [Captivate] deal were taking place before 2013." As the court found, however, "there may have been some initial/preliminary work in late December, 2012," and "only a sliver of activity [had] been identified as possibly occurring in late December, 2012," none of which entitled the defendant to the $150,000 finder's fee. Thus, exhibit 20 does not undermine the court's finding that the defendant did not perform substantial services prior to 2013 that entitled him to the $150,000 finder's fee.

[15] In challenging the court's ordering disgorgement of $50,000 of the $150,000 consulting fees, the defendant also asserts that the court engaged in speculation and ignored evidence in the record in making certain factual findings. Because we conclude on other grounds that the court improperly ordered disgorgement of $50,000, we need not address the merits of these assertions.

[16] The court also found that there was no credible evidence that the defendant performed posttermination services for Captivate for which he had earned the $150,000 consulting fees; however, the defendant did not bear the burden to prove the same on remand.

In addition, we note that the court's finding that there was no credible

evidence reflecting that the $150,000 consulting fees were earned for work done by the defendant on the Captivate deal in 2013 should not be conflated with the court's separate finding that the defendant's work on the Captivate deal in 2013 led to his *opportunity* to earn the $150,000 consulting fees, which comprised the foundation of the court's decision to order the disgorgement of $50,000. See *Hospital Media Network, LLC* v. *Henderson*, supra, 187 Conn. App. 59 n.15.

Last, we recognize that the court on remand highlighted the defendant's discovery violations as limiting the plaintiff's ability to demonstrate damages. Although, as the court reasonably found, the defendant's noncompliance with discovery generally hampered the plaintiff's efforts to prove damages, the plaintiff nonetheless was able to offer evidence concerning the defendant's posttermination consulting agreement with Captivate, a copy of which was admitted in full and about which Hertzmark was able to testify.

[17] The defendant asserts that the "evidence relating to exactly how much [he] was 'diverted' by the Captivate deal in 2013 is extremely thin . . . ." As the court found, and as the record reflects, the defendant performed substantive services in furtherance of the Captivate deal while employed by the plaintiff in 2013, including responding to questions sent by Hertzmark regarding Captivate and reviewing due diligence information. To the extent that the defendant claims that the court clearly erred in finding that he was diverted from his employment with the plaintiff in 2013, we reject that claim.

———————————————